Bob SARGENT and wife, Johnnie Sargent; Durwood Joseph Thevenote and wife, Corrie Sue Thevenote; C.W. Gilbreath and wife, Louise Gilbreath, Appellants,

v.

Walter H. SMITH, Appellee.

No. 09–92–306 CV.

Court of Appeals of Texas, Beaumont.

Sept. 30, 1993.

Deborah Heaton McElvaney, Wells & Assoc., Houston, for appellant.

Larry Foerster–Darden, Fowler & Creighton, Conroe, for appellee.

WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

A suit was filed below initially for declaratory relief under the Uniform Declaratory Judgment Act, TEX.CIV.PRAC. & REM.CODE ANN. § 37.001, et seq. (Vernon 1986). Appellee concedes that the appellants are owners of certain lots in the Lake Renee Subdivision which is located entirely in Montgomery County.

The appellants, inter alia, have sued under the "Restrictions and Covenants Pertaining to Lake Renee Subdivision situated in Montgomery County, Texas." (Restrictive Covenants). The document containing such restrictions and covenants is recorded in the public deed records of Montgomery County. Appellee also concedes that the appellants additionally own and possess an interest in a park pursuant to a plat and dedication of Lake Renee Subdivision in the map records of Montgomery County.

In the year 1989, the appellants filed a suit against the appellee originally in the form of a Trespass to Try Title cause of action alleging that the appellee had unlawfully entered the subdivision park. Appellants sought actual damages, exemplary damages, interest, and cost of court.

Subsequently, the appellants amended their Trespass to Try Title Petition and added pleadings for declaratory relief under the Uniform Declaratory Judgment Act requesting also the cancellation of appellee's (1) interest in a 6.51 acre tract of subdivision park land, and (2) appellee's easement across lot 23 of the Lake Renee Subdivision.

Later the appellants filed and urged a motion for nonsuit on their Trespass to Try Title action. The order of nonsuit was signed by the court on June 10, 1992.

Appellee amended his original answer. Appellee pleaded a general denial and certain specific denials. The appellee then set forth certain affirmative defenses.

### Smith and Spiller, Developers

Arnold Smith and W.T. Spiller were developers. The Lake Renee Subdivision was developed in the year 1960 by W.F. Spiller and Arnold Smith. The subdivision was developed out of 107.9 acres of land situated in the John Saddler survey and the John Hostetter survey. These developers created 24 residential lots. They also created a lake known as Lake Renee. Approximately 41 acres of land was set aside and designated as a park. They executed a general warranty deed dated February 3, 1969, conveying to one Gene Walraven a 22.156 acre tract of land which was adjacent to (but no part of) the said subdivision. Simultaneously, Arnold Smith conveyed to Walraven some purported type of interest in a 6.51 acre tract of land that was said to be situated in the northern part of the designated park land and also an *easement* in or on lot 23 of the original Lake Renee Subdivision acreage. A large portion of the 6.51 acre tract was inundated when Lake Conroe was completed in 1972. Appellee is the present recipient (or was at the time of trial) of a defective quitclaim to an undetermined interest in the 6.51 acre tract. The appellants set forth that the appellee wrongfully entered into the 6.51 acre tract, had constructed a boat ramp, a pier, and had built a fence across the park land. Also, appellants pleaded that he wrongfully cut and removed certain trees and certain other growing vegetation from the park land itself. Appellee had constructed wrongfully a road across the park land.

### Appellants' Pleadings

In sum, the appellants asked for a declaratory judgment and relief, inter alia, affirming as follows:

(1) the plat of Lake Renee Subdivision is a valid and existing plat;

(2) the restrictions are valid and enforceable as they pertain to the park land;

(3) defendant is not a lot owner in the Lake Renee Subdivision;

(4) defendant's quitclaim interest is subject to and governed by certain restrictive covenants provided for the use of the park land.

Damages were sought by the plaintiffs for the cost of removing the boat ramp and pier and the cost of removing the fence and for damages relevant to the cutting of the trees. Appellants further sought reasonable attorney's fees for the alleged breaches of the restrictive covenants under the provision of the TEX.PROP.CODE ANN. § 5.006 (Vernon 1984).

### A Juried Proceeding

The trial was before a jury and lasted for several days. At the conclusion of the plaintiff's case in chief the appellee filed and urged a motion for a directed verdict. However, the trial court took that motion under advisement. The appellee was allowed and instructed to present his case.

But at the conclusion of certain testimony, the court withdrew the case from the jury, granted the appellee's motion for directed verdict, discharged the jury, and entered judgment that the appellants take nothing by way of their suit.

### The Restrictive Covenants

Smith and Spiller, developers, adopted 15 restrictions and covenants governing the subdivision and the subdivision's development. Certain restrictive covenants pertaining to the park land of the subdivision were:

2. The park area shall be used as a park for the use and enjoyment of all the owners of Lake Renee Subdivision and no buildings shall be placed thereon without the written consent of all the owners of said Lake Renee Subdivision. (*Notice that the restriction speaks of the subdivision twice*). (emphasis added and words in parenthesis added)

8. The lake and park area as described on the map or plat of said Subdivision is

hereby dedicated for the use and benefit of the lot owners of said Subdivision, their immediate families, and guests only when accompanying them. (*Note again that the lake itself and the park area are actually dedicated for the use and for the benefit of the lot owners in the subdivision*). (emphasis added and words in parenthesis added)

In about 1957, a 22 acre tract of land was conveyed from a Mr. and Mrs. Gilford to the developers, Arnold Smith and W.F. Spiller. The Gilfords, by their deed, withheld all their watering rights so that their livestock could cross the property to a certain creek known as Hustler Creek. This creek was subsequently dammed by the developers for the creation of Lake Renee. The developers planned to convey lots in the Lake Renee Subdivision to certain individual lot owners along with an undivided 1/24 interest in the park area.

### The Restrictive Residential Use of the Subdivision

*Lake Renee Subdivision was developed for residential use only.* A certain deed restriction carefully and specifically prohibited any type of commercial enterprise or business. Another effective deed restriction prohibited speed boats and boat racing on Lake Renee. In the year 1972, the San Jacinto River Authority, being a political entity, created Lake Conroe. This lake, it is alleged, had engulfed the smaller Lake Renee along with portions of certain of the 24 lots and a portion of the park.

The lot owners of the Lake Renee Subdivision had executed general warranty deeds to the San Jacinto River Authority in lieu of condemnation. These owners conveyed to the authorities those portions of lots lying below the 201 foot above sea level elevation and their individual interest in the park area below the 201 foot elevation. Some parts of the appellee's structures were at the 205 foot level.

Subsequent to the recording of the plat and restrictive covenants for the Lake Renee Subdivision—indeed a number of years later—the developers Spiller and Smith jointly executed a general warranty deed conveying

to Gene S. Walraven the Gilford 22 acre tract of land which was situated adjacent to the subdivision. By deed Smith also conveyed his interest in the 6.51 acre tract of land said to be located in some northern portion of the designated park land and a road easement. Walraven conveyed to Aziz.

### The Aziz, Trustee, Question

■ By an earnest money contract, the appellee said he was to acquire everything that had been conveyed to Aziz including any property rights, if any, in the 6.51 acre tract of land. But, in the conveyance the 6.51 acre tract was not included. In fact, the appellee conceded that he discovered this alleged mistake as late as 1989 when the appellants complained of appellee's improvements and structures to the 6.51 acre portion of the park. Aziz, after the appellants' complaints, attempted to correct the alleged error by executing a quitclaim. Generally speaking, a quitclaim conveys no title or actual interest in land but merely transfers a claim.

■ *In any event we conclude that appellee was not a lot owner in the Lake Renee Subdivision.* Indeed, appellee never acquired a lot. Appellee at least had constructive notice of all the rights, interests, and privileges of the actual lot owners in the subdivision. The park was kept in its original state for about two decades. Even though a motion for instructed verdict was granted, the trial court nevertheless declined to approve or find the appellee's affirmative defenses. The trial court concluded that the deed restrictions were enforceable and that the residents and actual lot owners of Lake Renee Subdivision had not abandoned the park land or any of the restrictive covenants. These trial court findings were extremely important.

### A Finding of the Trial Court

■ The trial court found that the appellee was a property owner and for that reason was entitled to use the park land; subject however, to the restrictive covenants and that the appellee had not violated the restrictive covenants because his use was consistent

with one of the restrictive covenants, which is set out above. We, with respect, disagree.

But we determine that the restrictive covenants should be construed harmoniously as a whole and that the learned, scholarly trial court fell into error in its construction of the restrictive covenants. The trial court did not heed the restrictive matters set out in the restrictive covenant number eight which specifically mandates that the lake and park area are dedicated for the use and benefit of the lot owners and their immediate families. Appellants were owners of whole lots. It is clear that the interest that appellee received in the 22 acre tract and in the 6.51 acre tract were subsequent to the platting of the Lake Renee Subdivision and the deeds into the lot owners. Appellee never owned a lot.

### The Lot Owners' Benefits

The restrictive covenants were for the benefit of the lot owners and a serious, material issue was raised as to whether the appellee took his conveyances and quitclaim subject to the superior rights of the original lot owners. We conclude appellee did so take. Appellee's position is inferior. Hence, with respect, we think that the instructed verdict was erroneous. We conclude that the appellants are actual owners and are lot owners in the Lake Renee Subdivision. The record glaringly so reflects. This status of being lot owners is of paramount importance. *As lot owners they are entitled to the benefits of all the restrictive covenants.* The quitclaim—we perceive for several reasons—into the appellee conveys no interest in land or real estate; it conveys no title, it merely attempts to transfer some nature of a claim. Appellee is certainly not a lot owner in the subdivision. Even the quitclaim is indefinite and uncertain as to any undivided and unspecified interest to the 6.51 acre tract of land.

### The Developers and the Lot Owners

It must be stressed that the developers set aside a large tract of undeveloped land as a park that was designated for the use and enjoyment of the lot owners of the subdivision. There is evidence that the restrictive covenants were vital to the subdivision and the lot owners to insure uniformity and harmony in connection with the subdivision. The developers adopted 15 enumerated restrictive covenants that were relevant to and attendant to the subdivision. It should be specifically noticed that covenant eight mandated:

8. The lake and park area as described on the map or plat of said Subdivision is hereby dedicated for the use and benefit of the lot owners of said Subdivision, their immediate families, and guests only when accompanying them.

It should be stressed that the developers intended for the individual lot owners to enjoy the whole park. Many lot owners obtained a $\frac{1}{24}$ interest in the park. This $\frac{1}{24}$ interest, (in and of itself) we think, is evidence of cogent probative value and such probative evaluation as to raise the issue that it was the lot owners who had the interest in the whole park land area and the right to enforce covenant 8 along with other covenants.

Since there were 24 lots and 24 lot owners and the undivided interest was $\frac{1}{24}$, this evidence shows compellingly that the lot owners owned the whole park area. If there is an issue of lack of standing, it would seem that Walter Smith, the appellee, has lack of standing under the restrictive covenants. Appellee, it was shown, knew of the restrictive covenants.

We perceive that there existed evidence and reflection in the record that it was intended that the development of the area of the 41 acre park land was to be preserved in its natural, undisturbed state. The park remained in its natural state for about 20 years. Generations of children and young people, as well as lot owners, enjoyed this natural and undisturbed environment with the accompanying presence of various species of small animal life and plant life. This natural habitat nurtured wild deer.

### Appellee's Action

However, in 1983 and later, the appellee crossed the property and crossed the boundary line and went onto the park land, cut down certain trees and certain foliage, and built or improved a road across the park

land. Indeed, the appellee completely fenced off a portion of this park. But appellee must be governed by and subject to the restrictive covenants on file in the public records of Montgomery County.

### The Standard of Review

■ We approach a threshold, paramount issue. That issue is the correct standard of review involving the granting of a directed verdict below. Of course, under TEX.R.CIV.P. 268 a motion for directed verdict shall state the specific grounds therefor. And a directed verdict is sustainable on appeal only where there is an absence of any material fact issue or issues. *Qantel Business Sys. v. Custom Controls*, 761 S.W.2d 302, 304 (Tex.1988). In reviewing a case and record on appeal in which a verdict has been directed, the intermediate appellate court must view the evidence and reasonable inferences therefrom in the light most favorable to the party against whom the directed verdict was rendered and the intermediate appellate court must disregard all contrary evidence and contrary inferences. *White v. Southwestern Bell Tel. Co., Inc.*, 651 S.W.2d 260, 262 (Tex.1983); *Collora v. Navarro*, 574 S.W.2d 65, 68 (Tex.1978). Indeed, if the appellate court finds that there is any evidence of probative value which raises a material fact issue, then the judgment must be reversed and the cause remanded for the jury's determination.

■ Thus, it follows that a directed or instructed verdict is warranted only when the entire record shows that no other verdict could have possibly been rendered (a movant is entitled to a directed verdict when reasonable minds can reach only one conclusion from the entire evidence) and that the winning party was and is entitled to judgment as a matter of law. *See and compare Dryden v. City Nat. Bank of Laredo*, 666 S.W.2d 213 (Tex.App.—San Antonio 1984, writ ref'd n.r.e.).

■ In properly applying the correct standards, the trial court must accept as true all evidence (which must be liberally construed in favor of the losing party) which tends to support the losing party's contentions and positions. The trial court must discard all contrary evidence and inferences that are favorable to the movant. The trial court cannot pass upon the credibility of the witnesses.

■ The rule is well established and has been observed by the courts of this State that it is error to instruct or direct a verdict when the evidence or the record raises any material fact issue. Where there is any conflicting evidence in the record of probative value a determination of that issue is for the jury. *Air Conditioning v. Harrison–Wilson–Pearson*, 151 Tex. 635, 253 S.W.2d 422 (1952); *White v. White*, 141 Tex. 328, 172 S.W.2d 295 (1943).

### The Question of Material Issues

■ Fact issues have presented themselves concerning what is meant by and what constitutes a building on the park land. These matters, we perceive, are certainly issues in view of the directed verdict—although we think these matters are relatively clear. But the whole case was not developed. Thus, on these additional grounds we feel constrained to reverse the granting of the instructed verdict.

Furthermore, other issues are the rights and prerogatives of the lot owners to give their written consent before any type of building can be constructed on the park land.

Covenant two mandates that the park area shall be used as a park for the use and enjoyment of all of the owners in the Subdivision. Appellee's fence raises the issue—a paramount one—that all the lot owners were deprived of the use and enjoyment of an important part of the park. This is pursuant to the restrictions which were dated January 16, 1960, and recorded in the public records of Montgomery County and of which appellee had notice.

Among others, there is a restrictive covenant that reads:

15. ... It is understood herein that these restrictions and covenants are adopted for the purpose of insuring uniformity and harmony in connection with the buildings erected and to carry out a general plan for protection, benefit and use of

every owner and/or purchaser of lots therein, *which will enhance the value of said lots* for each and every owner and/or purchaser. (emphasis added)

Notice the importance and emphasis placed in lot owners. The record reflects that the appellee makes no claim of title or ownership to any whole lot of the Lake Renee Subdivision. Answering interrogatories the appellee took the position that his only claim to any part of the park was by way of a quitclaim from Jorge Aziz. Furthermore, the appellee conceded and admitted that he occupied a portion of the shoreline, which shoreline also borders the park. Appellee stated that he had constructed a boat ramp there. Appellee also admitted that he built or improved a roadway in the park. He also admitted that he had constructed a boat ramp and that it was on a portion of the land that constitutes a part of the park area of Lake Renee Subdivision, although the appellee states that the boat ramp is also on the shore of Lake Conroe. Part of the boat ramp and pier are at 205' above sea level.

There also exists a restrictive covenant that all roads shall be for the use of the actual occupants of the subdivision. Furthermore, there was and is created an easement of 15 feet (land ward—inland) in width from the normal water level of the lake shore and adjoining to the lake. This easement is, of course, on the land next to the lake. This easement is dedicated for the use and benefit of all of the lot owners in the subdivision.

The record reflects that no fence or barricades shall ever be placed across said easement or any part thereof *and the easement shall remain open for the use and benefit of all of the lot owners in the subdivision. Indeed, Lake Renee and the park area itself, as described and dedicated on the map or plat of the subdivision, was and is dedicated for the use and benefit of the lot owners of the subdivision.* But appellee has fenced off a part of the park land area. Appellee has excluded the lot owners.

Without any criticism whatsoever some of the documents are difficult to read no matter how much effort is made to do so with a magnifying glass and other aids. Some of the documents are simply illegible. But we have done the very best that we can considering the state of the record before us.

### The Warranty Deed from Aziz, Trustee, to Appellee

 We must note with interest and we must stress a certain document that is entirely legible that is in the record before us. It is a general warranty deed from Jorge Aziz, as trustee, to Walter H. Smith, appellee. It recites a valuable consideration and a certain large promissory note as part of the consideration. And significantly it clearly contains the following language:

> This conveyance is made and accepted subject to any and all restrictions, minerals, covenants, conditions and easements, if any, relating to the hereinabove described property, but only to the extent they are still in effect, shown of record in the hereinabove mentioned County and State, and to all zoning laws, regulations and ordinances of municipal and/or other governmental authorities, if any, but only to the extent that they are still in effect, relating to the hereinabove described property.

Therefore, appellee had actual notice.

It is interesting to note that in the deed from Gene S. Walraven to Jorge Aziz, trustee, (Jorge Aziz being immediate predecessor in title to the appellee) that the 6.51 acre tract of land is referred to and that in that same instrument it is specifically provided that that conveyance is subject to all and singular the restrictions, covenants, conditions and easements, if any, of record in the office of the County Clerk of Montgomery County, Texas, applicable to and enforceable against the above described property. Again, appellee received notice.

Such language certainly leaves the implication that the grantor Gene S. Walraven certainly wanted to protect himself and his heirs and assigns under his warranty so that they would not be liable. Appellee took subject to this deed. We conclude that the documentary evidence itself defeats the granting of a directed or instructed verdict.

### The Quitclaim from Aziz

■ The grantee, appellee Walter H. Smith, in the receipt of the quitclaim took subject to the public record and had constructive and actual notice of the restrictions and covenants. In fact, the quitclaim which only uses that word "quitclaim" in the early part of that instrument is, we think, badly flawed, if not fatally flawed. Aziz deals with his right and interest in the "above described property" which is not above described. Aziz quitclaimed unto the said grantee, who is appellee Smith, (Smith's heirs and assigns forever) so that neither they (Smith's heirs and assigns) nor "_____" heirs, legal representatives or assign shall have, claim, or demand any right or title to the property, the premises or appurtenances or any part thereof. The quitclaim is incorrectly worded and important blanks imprinted thereon are simply left blank. Since the quitclaim reads unto the said grantee, his (Smith heirs and assigns forever) so that they (including Smith, Smith's heirs and assigns) nor their legal representatives or assigns shall have claim or demand for any right or title to the property, premises or appurtenances or any part thereof; even the quitclaim is defeated and unhorsed. We concluded that when the quitclaim is carefully read the grantee-appellee received nothing and his heirs and assigns can claim nothing.

■ Appellee conceded he may have made a mistake and been in error concerning his actions on the 6.51 acre tract. Appellee, by attempting to obtain a quitclaim, acknowledged his title and standing were deficient.

Furthermore, Tex.Prop.Code Ann. § 202.-003 (Vernon Supp.1993) provides that restrictive covenants shall be liberally construed to give effect to their purposes and their intent. As well, section 202.002 provides that the legislative enactment involved applies to all restrictive covenants regardless of the date on which they were created. In turn, "restrictive covenants" are defined as "any covenant, condition, or restriction contained in a dedicatory instrument, whether mandatory, prohibitive, permissive, or administrative." Sec. 202.001(4).

■ Therefore, in construing the pertinent and relevant covenants so that their purposes, intents, intendments, and intentions be made effective, it is mandatory that the fact-finder ascertain such elements as the purposes, intents, and intentions of the developers in preparing and making a public record of the restrictive covenants, restrictions, and other limitations governing Lake Renee Subdivisions. *See and compare Travis Heights Imp. Ass'n v. Small,* 662 S.W.2d 406 (Tex.App.—Austin 1983, no writ).

### The Defective Quitclaim Revisited

Furthermore, concerning the quitclaim we note that the one in the record failed to set out a date of execution and quitclaimed nothing due to the uncertainty and, indeed, the inconsistent and self destructive language used. It was not properly notarized. It would appear from a careful reading of the so-called quitclaim (or more correctly some nature of written paper), that the parties and the notary public were rather careful to see that no meaningful or no definite date of any sort was ever set forth. It appears to have been recorded in early May of 1989 which was very late in relation to the other deeds and documents in the case.

Moreover, the claim that is to be quitclaimed is too indefinite and uncertain for an executing officer such as the Sheriff to put the appellee in possession.

### The Testimony of the Plaintiffs

■ There exists testimony of strong probative force and value by one of the plaintiffs who unequivocally stated that he owned two lots as a lot owner in the subdivision and that he had clearly been granted an undivided interest in the park land and that he wanted to use the park and did use the park. He testified that there was a fence put up which absolutely transversed the park and kept this particular plaintiff from going on a part of the park land. This fence was offensive to him and, of course, if the fence were permitted to stand, then prescription or title by limitation would ripen. His testimony, in our opinion, defeats the granting of a directed or instructed verdict. We note:

Q. All right. Does that fence offend you?

A. Any fence across any property I have an interest in would offend me, yes, sir.

Q. How does it offend you?

A. Well, it's—people fence in something I think belongs to me, I don't think that's right. And if I want to cross into that property there I used to consider part of the park, or still consider part of the park, I can't do it.

This witness also actually claimed that the pier was built on his property without permission. This witness testified that all or a portion of the lake had been taken into Lake Conroe through the San Jacinto Authority; but, nevertheless, at least half the park was still there and that that half belonged to the lot owners and they were deprived of access to the northern portion of the park. We note in the record:

Q. All right. So, at any rate, you have got a ¼th interest in the park?

A. For sure, yes, sir.

Another witness testified that his children had a very good time in the woods in the park and the girls knew the wildlife in the woods. They used to feed the animals. They would put food out at night. They would see a fox now and then. The park was in its natural state; it was like a natural forest. This witness would have bought a lot, he said, on the other side of the lake but he wanted to be on the park's side because he felt like he and his family would see more animals. The trees were beautiful. This witness testified that the appellee built a pier and a boat ramp, a fence, a road and appellee also cut some trees off the park. Appellee did not have permission to do any of these things.

This witness talked to the appellee and asked the appellee to contact the other property owners and he suggested and stated that he, the witness, thought that the appellee had definitely made a mistake. Appellee thought about it some and came back later and talked to this witness on the same day. Appellee admitted and stated that possibly he had made a mistake; but appellee did nothing to correct his mistakes.

The fence that was built also offended this witness because he did not like for anybody to actually fence off a portion of land in which he had an undisputed ¼ interest and this witness also testified that Smith, the appellee, did not have an interest in the park. Also, the boat ramp was offensive and bothered this plaintiff because appellee had taken over a part of the park land and had cut down trees to make a road to the boat ramp. There exists pictorial evidence to substantiate the fact that there was a clearing cut—a fairly large one—adjacent to the boat ramp.

Furthermore, the plaintiffs raised the issue that they had to prosecute this case to protect their rights and that they could not permit these matters to ripen and mature by prescription or limitation and that to do so substantial attorney's fees, expenses and court costs were incurred. They testified that these expenses amounted to a lot of money. Hence, appellants did show large damages and expenses and an inability to use all of the park land.

The record reflects that the appellants had had as of the date of trial $20,000 in costs, attorney's fees, and other expenses.

### Partial Testimony of Appellee

We think that a very important and highly persuasive phase of the record clearly demonstrates that the 6.51 acre tract in which Smith has claimed some nature of undivided interest was deraigned in his chain of title from the original subdividers into Walraven. Then Walraven to Aziz and Aziz into appellee, Walter Smith. Walter stated:

Q All right. Then who does Mr. Walraven buy his—buy the land from?

A The developer, Arnold Smith and Mr. Spiller.

Q All right. And, do you remember how long ago he purchased that land?

A Mr. Smith, I believe it was in 1957.

Q Okay.

A That's—that's just from memory.

Q Yes, okay. Okay. Now, that's fine. Now, the deed from Mr. Smith to the developer of all that land out there to Mr. Walraven, do you know and did that deed contain an undivided interest in and to a 6.51 acre tract of land?

A Yes, sir.

Q And that 6.51 acre tract of land extended on south into Lake Renee subdivision, and was later inundated by the San Jacinto River; is that correct?

A Part of it was.

Q Right. And the only thing that is left of that 6.51 acres is this sliver on which you put up the fence and built a boat ramp; is that correct?

A Yes, sir.

. . . .

Q Okay. Does it tell us how much of an undivided interest?

A No, sir.

Q What does it say? Just all of my undivided interest?

A Yes. It don't say how much, it just says whatever I got.

Q Okay. Okay, that's fair.

. . . .

Q (By Mr. Rippy) Now, I'm going to show you—and this is the deed—I am going to remind you that this is the deed that is in your chain of title, through which you're claiming, okay? This is the deed from Smith to Walraven. I am going to ask you to read a paragraph here, on page 756 of that deed and I have checked it here. I want you to read those words to the jury.

A "The conveyance of second tract above described is made subject to the rights of other owners in and to Lake Renee Subdivision and to the existing rights of San Jacinto River Authority in and to such strip or parcel of land."

In his own chain of title appellee, Walter Smith, took the conveyance of the second tract—whatever that undivided interest was—subject to the rights of the lot owners in and to the Lake Renee Subdivision.

Appellee admitted that he did not contact any of the property owners in the Lake Renee Subdivision to tell them what he was doing as to constructing the roads, building the fence, and building the boat ramp and pier. Further, and of paramount importance, the appellee, Smith, admitted that he still did not know who owns the park land and he also admitted that he did not own a lot in the Lake Renee Subdivision. The fence he built contained no gate and he admitted that he widened the road when he built the boat ramp and this was tantamount to a confession and admission that he did not leave the park land in its previous, natural state. Ultimately, the appellee testified that he had thinned heavily the pine trees out of the 6.51 acre tract.

■■■ As an additional matter that at least raises a material issue, the appellee does not seriously challenge the fact that in deed restriction number one, the very first deed restriction, requires that *the entire subdivision be used for residential purposes only and thereby prohibited any type of commercial enterprise or business enterprise.* In connection therewith, the record reflects the appellee operated a small ranch wherein both cattle and horses were raised.

### The Standard in the Ninth Court of Appeals

*Do v. Huber, Formagus, Holstead & Guidry,* 728 S.W.2d 852 (Tex.App.—Beaumont 1987, no writ) is on point. In *Do, supra,* our Ninth Court of Appeals held that for a directed verdict to have been proper, there must have been absence of fact issues and the test for determining fact issues is this: "When reasonable men may differ as to the truth of controlling facts, a jury issue is present." Also, when a conflicting testimony exists in a record, jury issues are present. Chief Justice Dies for a unanimous court wrote:

In carrying out this assignment, *the trial court, without passing upon the credibility of witnesses, must accept as true all evidence in which, when liberally construed in favor of the adverse party,* tends to support such adverse party's contentions, and discard all contradictory evidence favorable to the movant. (citations omitted) (emphasis added)

We reverse the judgment and remand the cause because we have found error. As an additional ground we have reversed the judgment and reversed the cause for trial on the merits in the interest of justice. We do not

write on a clean, unused slate. We are bound by higher precedents.

REVERSED AND REMANDED.