John E. COGAN, et al., Plaintiffs,

v.

**TRIAD AMERICAN ENERGY, et al., Defendants.**

**Civil Action No. H–87–4106.**

United States District Court, S.D. Texas, Houston Division.

Oct. 15, 1996.

---

Edward K. White, III, Nashville, TN, for Plaintiff.

O. Clayton Lilienstern, Houston, TX, for Deloitte & Touche.

Randy J. McClanahan, Houston, TX, for Atlantic Financial Federal.

Devon Howard Decker, Houston, TX, for Corroon & Black.

Tracie Jo Renfroe, Houston, TX, for Lloyd's of London.

David C. Redford, Houston, TX, for Commerce Bank.

## OPINION ON SUMMARY JUDGMENT

HUGHES, District Judge.

### 1. *Introduction.*

John E. Cogan and a large group of others invested in a limited partnership to build windmills in California for generating electricity. The project faltered, and the general partner went bankrupt. To recover their lost investment expectations, the investors sued every business remotely related to the transaction. The partial loss of their investment, according to these investors, had nothing to do with economic risk. These part-

ners say they were duped by the bank, banker, insurance carrier, insurance brokers, and accountants. Of course, they were duped by the issuer of the interests itself, but its bankruptcy precludes that recovery. Their claims at common law and under state and federal securities and consumer laws are worse than their investment.

## 2. *Background.*

The Triad VII Limited Partnership is one of a series of investment partnerships organized by Triad American Energy Company. As part of the government-encouraged effort to establish alternative energy sources, the partnerships were organized to develop "wind parks" to generate electricity from desert winds. The electricity would be sold to utilities in Southern California, and the government would furnish tax incentives. Cogan bought limited partnership interests offered by Triad under a private placement memorandum during the second half of 1985.

To help investors buy interests, Triad arranged for a California bank to lend the investors part of the purchase price. The note to the bank was without recourse to the partner personally, so that the investor risked only his partnership interest that was pledged as security. The scheme had speculative risk, extraordinary tax benefits, and high leverage.

In the first half of 1985, Triad bought ESI; it was one of the companies that had manufactured the turbines. Triad took the precaution of having ESI obtain an insurance policy to secure its manufacturer's warranty. Problems developed in the project, and Triad went bankrupt. With the performance of the windmills doubtful, Cogan declined to pay his note to the bank. The bank itself failed. By the time the bank's receiver got around to collecting the notes, the investment outlook had improved. To retain their partnership interests, the investors reached an agreement with the bank's receiver to resume paying.

The partners persist, however, in this suit to recover the diminution in the value of their investment caused by a conspiracy to cheat them, evinced by the delay in success in the wind park venture and limited proceeds from the warranty insurance.

## 3. *Parties.*

The investors have sued the lending bank, the loan officer, the insurance brokers, the underwriters at Lloyd's of London, and the accountants. All of the investors' claims fail.

## 4. *Bank.*

Atlantic Financial Federal Bank was a bank in Philadelphia with a California subsidiary. It allowed Triad to tell potential investors that it would lend purchasers of Triad interests part of the purchase price. The bank failed, and it was succeeded in part by a receivership under the FDIC and in part by a new bank. The bank did lend to the investors, who all signed disclaimers as part of their loan applications, swearing in part:

> In this transaction Atlantic is acting solely as a lender and not as an investment advisor; Atlantic has made no attempt to analyze or evaluate my intended investment; Atlantic has made no promises or representations to me concerning my intended investment; and Atlantic has given me no opinion or advice as to whether it is wise or prudent for me to invest my funds as intended. In making this intended investment, I am not relying in any way upon anything Atlantic has said or done, or upon Atlantic's role as a lender to me or to other investors, or upon any knowledge Atlantic may have with respect to my investment or the entity in which I am investing.

The effect of the disclaimers is clear. Each plaintiff agreed, as a condition to borrowing money from Atlantic, that it had not received representations from the lender and was not relying on what the lender had said or done in making his investment decision.

■ The new bank is not responsible for the old bank. As a matter of federal law, the borrowers are estopped from asserting defenses based on unwritten or unauthorized promises in agreements with members of the failed institution. *See D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942); 12 U.S.C. § 1823(e). This doctrine bars the defenses based on misrepresentations made by Atlantic to induce the

borrowers to execute their notes. The borrowers knowingly purchased the limited partnership interests that they now deem corrupt and signed disclaimers absolving Atlantic of responsibility for their decision to invest.

As a consequence of the receivership, claims against the old bank for its wrongs have been transmuted into claims against the bank's estate. The Federal Deposit Insurance Corporation has the statutory authority to require claims against the estate of the insolvent bank to be adjudicated through its administrative procedure. The value of those claims depends on the extent of the impairment of the bank's capital. The claims against old Atlantic are not in this case.

Occasionally, Cogan asserts that Atlantic was an escrow agent under the offering memorandum. It was for some of the partnerships, but it was only a commercial lender for the Triad VII partnership, the one he bought. He cannot recover damages for something wrong the bank did in a different role in a different partnership.

### 5. *Banker.*

David Barr was a loan officer at the bank. Among other officers, he processed loan applications from prospective partners in Triad VII. For the bank, Barr authorized the salesmen at Triad to tell prospective investors that Atlantic was willing to extend them credit with no investigation of the borrower and with only the limited-partnership interest as security. That was true. Only four of the investors had direct contact with Barr.

The investors complain that:

- He recklessly lent them money against normal banking behavior;

- He breached his fiduciary duty to them thoroughly to investigate the investment;

- He breached his fiduciary duty to them fully to disclose material information about the project;

- He had a conflict of interest with them; and

- He warranted that the investment was sound by his willingness to lend them money on the project.

A. *Reckless Lending.* If the banker lent recklessly, the law furnishes no redress for imprudent receipt of funds. No harm was done to the borrowers; they received borrowed funds in exchange for a promise to repay the loan. A borrower who has "no business" in buying an expensive car still owes the debt he incurred, even if the banker was foolish to lend him the money in the first place. Recovery for "reckless lending" belongs to the bank, its shareholders, and its insurers, not to the borrowers who spent the lent money.

B. *Normalcy.* The borrowers say that they were lent money contrary to normal banking practice, with the result that they not only do not have to pay the loan but that they get more money from the bank for its irregular, casual lending practices. The loans were consistent with "normal" banking practices at the time. The loans were probably contrary to responsible banking practice, but they were common practice a decade ago. The practices turned out to have been losers, which is why the bank itself failed.

C. *Creditor Fiduciary.* Loan officers ordinarily have no fiduciary relation to their borrowers. *Thigpen v. Locke*, 363 S.W.2d 247, 253 (Tex.1962) (although fiduciary relations include informal ones that arise when one party relies on and trusts another in context justifying reliance, the relation between a bank and its borrowers does not generally create fiduciary duties); *Texas Bank & Trust Co. v. Moore*, 595 S.W.2d 402, 405 [502, 505] (Tex.1980) (borrower-lender relationships in Texas are presumed to be arms length; no fiduciary relationship is implied); *accord, Lee v. Wal–Mart Stores, Inc.*, 943 F.2d 554, 557 (5th Cir. 1991). The banker as a lending officer had a fiduciary duty to the bank where he was an agent. Barr did not take the investors to raise, and he was not their trust officer. His duty to investigate and to disclose was to his employer, not to his employer's commercial loan customers. *See Thigpen*, 363 S.W.2d at

253. Here, the overwhelming majority of the investors never had direct dealings with Barr. The four investors who claim to have had direct contact assert that they had only one or two telephone conversations with him. The relation created between Barr and the investors was purely creditor-debtor.

The law rejects the proposition that lenders become fiduciaries by exchanging business information or "advice" with their borrowers. *E.g., Winston v. Lake Jackson Bank,* 574 S.W.2d 628 (Tex.Civ.App.— Houston [14th Dist.] 1978, no writ); *FDIC v. Eagle Properties, Ltd,* 664 F.Supp. 1027 (W.D.Tex.1985). In the final analysis, Barr merely was one of several loan officers processing loan applications for prospective Triad VII investors. Neither his position with Atlantic nor his relation with the investors creates a fiduciary duty on his part to the investors.

Absent a duty on the part of the lender, then, the failure to disclose the risk of an investment is not actionable. *See Chiarella v. United States,* 445 U.S. 222 [100 S.Ct. 1108, 63 L.Ed.2d 348] (1980). Individual defendant loan officers do not have a duty. The overwhelming majority of the plaintiffs never had dealings with their creditors. As a matter of law, this brief contact is insufficient to create a fiduciary duty.

D. *Investigate & Disclose.* Because the banker and the investors were simply the opposite sides of a business transaction, no fiduciary relation arose between them; therefore, the banker's failure to investigate the investment or to disclose facts about it could not breach a nonexistent duty.

For its own account, the bank should have investigated the business of Triad's partnership because it was taking the partnership interest as security. If it investigated, it came to the same conclusion that the investors did, and it suffered the same losses they did. The investors never asked the bank for disclosures. Having elected to save themselves the transaction cost of making an investment investigation by relying on the bank's credit investigation, they elected to adopt the result as their own.

E. *Conflict of Interest.* The loan officer and the investors as borrowers had no conflict; they are just on opposite sides of the transaction. They share an interest in the transaction, but their interests are distinct, reciprocal, parallel claims; neither acts for the other. The investors say that Barr was trying to promote his career by tricking them into borrowing money on this deal. It was his job to generate business, and everyone works to make money. Assuming the banker made mistakes and sought promotion at the bank, none of these acts affected the borrowers' investment decisions. No borrower knew of the bank or banker until each had investigated the investment for himself.

F. *Implied Warranty.* As an express public policy, the federal statutory separation of commercial and investment banking precludes the investors from relying on the acts of the bank; therefore, no commercial credit or lending decision can be construed as investment advice. Glass–Steagall Act, 12 U.S.C. § 24, subd. 7.

Furthermore, each investor expressly disclaimed the responsibility of the lender for his investment in Triad VII. As a condition of the loan from Atlantic, each investor agreed that, in making his investment decision, he had not received representations from the lender and had not relied on anything the lender had said or done.

G. *Express Representation.* The only representation made in the transaction between the banker and the investors was made by the investors when they promised to repay the money. The bank kept its promise when it lent them money. There was no wrong done by the banker.

The investors say that the banker was in league with Triad because they conspired to make money from the investor-borrowers. It is belaboring the obvious to posit that everyone in the transaction was motivated by the expectation of profit. The banker ex-

pected to profit from the loans, and the investors expected to profit from the higher return on the investment than the cost of the funds.

To the extent that the investors imagine that the banker was truly *in pari delicto* with the issuer of the security, the banking transaction was suicidal rather than homicidal. The investors pledged only their partnership interests in Triad VII to secure the loan. To complete its part of the plan to cheat the investors, claim the plaintiffs, the bank had to exchange actual American dollars for a security interest in an asset it knew was worthless. Not only is this unsupported by facts, it is manifestly absurd.

### 6. *Insurance Brokers.*

As agents for underwriters at Lloyd's of London, Corroon & Black sold ESI an insurance policy to cover the manufacturer's warranty of the turbines in 1982. ESI had made the turbines and had warranted their performance to the partnerships purchasing them. The policy specified the performance it guaranteed in a schedule. The policy assured payment of revenues lost from turbine failure or downtime. The policy's obligation was limited by a deductible of 877 hours per year of downtime, which is 10% of the expected productive hours in a year. The broker sent copies of the policy to the manufacturer and to the general partner.

The Lloyd's policy was an insurance contract solely between ESI and Lloyd's. Cogan was not an insured under the Lloyd's policy. Corroon & Black never acted as an insurance broker for either Triad or Cogan.

The offering memorandum said that there was a policy from Lloyd's that indemnifies ESI for its liability on the warranty to the partnership. The broker did not generate the representation about insurance in the placement memorandum. The policy was not attached to the offering memorandum, but it was "available." No investor has said that the broker represented anything about the policy. No investor saw the policy. Furthermore, the investors signed subscription agreements, on which they indicated that they did not rely on any representations not in the offering memorandum in making their investment decision.

The policy as issued included the limitation that it covered the standard downtime expected for this type of equipment, rather than actual insured downtime. In part, the underwriter relied on the repair schedule prepared by the manufacturer. The investors complain that because the broker did not cause the downtime limitation to appear in the policy itself, the broker should be held liable for failure to disclose it. The investors never saw this policy, and the 877-hour deductible is in the offering memorandum.

Cogan asserts that the policy was altered by a series of secret agreements among ESI, Lloyd's, and Carroon & Black. Apparently the manufacturer bought warranty insurance from an underwriter through a broker. The broker issued the policy as a binder before the underwriter had completed its review of the risk, and the risk actually accepted was lower than that described in the policy so an addendum was issued by the broker to conform the policy to the accepted risk. The difference between standard and actual downtime not in the memorandum; it could not have been material to an investment decision. There were changes—like assignability—that benefited the investors. The meetings were private rather than secret.

Later, Triad paid Carroon & Black a fee to help it expedite presentation of claims to Lloyd's. Assisting with claims is a distinct service from procuring the policy. The broker was an agent of the manufacturer in presenting claims to the underwriter; on the other hand, the broker was the agent of the underwriter in the issuance of the policy. None of this makes them part of the offering team of the securities.

Whatever the policy said when the memorandum was delivered, the investors could rely only on the vague statement in the memorandum, not on the actual contents of the policy since none of them saw it. The change in the policy through the addendum did not change the substance of the statement in the memorandum; it was true, although feebly true, perhaps.

■ The investors assert that Carroon & Black had an affirmative duty to disclose to them that there was a standard downtime agreement. Having delivered the policy and collected the premium, the broker's duty was done. A confidential relation in the insurance context arises only between insurers and their insureds. *See Love v. Fire Ins. Exchange,* 221 Cal.App.3d 1136, 271 Cal. Rptr. 246, 251–52 (1990) (stating that an insurer has heightened duties to its insured due to the special nature of the insurance relationship). Absent an express undertaking, neither an underwriter nor a broker has a duty to disclose the terms of a policy it has issued even though it knows the precise identity and the specific interest of a third party who may be financially affected by the nature of the policy. An insurance relation is not fiduciary to the potential creditors of the assured. *See Hassard, Bonnington, Roger & Huber v. Home Ins. Co.,* 740 F.Supp. 789, 791 (S.D.Cal.1990) ("this point have held that this [insurance] relationship does not produce a fiduciary duty"). Investors, lenders, contractors, customers, and others that deal with a company have the means to protect themselves by requiring certificates of insurance, by examining the policies, or by accepting the risk that inheres in their transaction with the assured.

■ Moreover, the terms of an insurance policy are confidential and proprietary between the insurer and the insured. *Griffith v. State Farm Mut. Auto Ins. Co.,* 230 Cal.App.3d 59, 281 Cal.Rptr. 165, 167 (1991) (information about policy limits is "personal information" between the insurer and the insured under the California Insurance Information and Privacy Protection Act). Corroon & Black would not disclose information about the terms and conditions of the Lloyd's policy because it was proprietary between ESI and Lloyd's unless told to do it by ESI, Corroon & Black's client. ESI never gave Corroon & Black instructions to disclose the terms and conditions of the Lloyd's policy to Triad or to Cogan. Corroon & Black was prohibited by law, therefore, from voluntarily disclosing that which Cogan complains. In the absence of a duty to disclose, Cogan's fraud claim has no foundation. *See Chase Chemical Co. v. Hartford Accident & Indem-*

*nity Co.,* 159 Cal.App.3d 229, 205 Cal.Rptr. 469, 476 (1984) (holding that "fraud based on concealment or nondisclosure ... is not actionable unless there is a duty to disclose"); *Byrum v. Brand,* 219 Cal.App.3d 926, 268 Cal.Rptr. 609, 617–18 (1990) (there is no cause of action for constructive fraud due to a party's nondisclosure unless there was a duty of disclosure based upon the existence of a confidential relation).

The broker, underwriter, and insured did not harm the investors or help Triad. The policy was bought by ESI for its own account. When Triad bought the manufacturer, the general partner took what the manufacturer had already bought. The transaction can be accurately summarized: The underwriter agreed to furnish a service, and that service may have turned out to be different from what the general partner had told its investors it would be.

Last, the investors argue that they were potential assignees to the policy and that status imposes a duty on the broker to disclose the policy's terms to them. Everyone is a potential assignee, and an assignee takes the place of the original insured *at the time* of the assignment. Although the investors could become assignees through an endorsement to the policy, and they would have joined the policy as it existed when the endorsement was added.

## 7. *Underwriters at Lloyd's.*

■ Lloyd's was sued too. To the investors, Lloyd's was just another supplier of services to the manufacturer of the turbines. The insurance was bought in England from California. Lloyd's had a relation only with ESI and later Triad, as insurer and beneficiary; without a relation between Lloyd's and the investors there is no violation of the Texas Insurance Code. Texas does not permit a person to recover unless there is a direct and close insurance relation between the wrongdoer and the claimant. *Warfield v. Fidelity & Deposit Co.,* 904 F.2d 322, 326 (5th Cir.1990). Absent privity of contract or some sort of reliance by the person bringing the claim on the words or deeds of the insurer, a suit will not lie. *See*

*Chaffin v. Transamerica Ins. Co.,* 731 S.W.2d 728 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Hermann Hosp. v. National Standard Ins.,* 776 S.W.2d 249 (Tex.App.—Houston [1st Dist.] 1989, writ denied). Moreover, the stated purpose of the Texas Insurance Code's article on unfair competition is to "regulate trade practices in the business of insurance ... *in this state,*" and to affect any person "engag[ing] *in this state* in ... an unfair or deceptive act or practice in the business of insurance." TEX. INS. CODE ANN. art. 21.21, §§ 1, 3 (1981). With little or no contact with the state of Texas, there are serious questions that the insurance code would even be applicable.

### 8. *Accountants.*

■ Cogan complains that Deloitte & Touche's review report in the placement memorandum was misleading. Essentially, the investor says that the accountant should have warned the investors of the nature of the project. Specifically, Cogan says that Deloitte should have reported that the estimates were wrong and that the company had no experience in the business. Cogan says Deloitte compounded its errors by not being as thorough in its review as standards required.

The investors acknowledged that they had knowledge of finance, securities, and investments generally and experience and skill based on actual, earlier participation to evaluate the merits and risks of investing in this partnership. The offering memorandum itself begins with the boldfaced instructions that "THIS OFFERING INVOLVES A HIGH DEGREE OF RISK." The sophisticated investors had clear notice of the riskiness of this venture.

### A. *Reliance.*

The memorandum itself is full of disclaimers. In bold-face type, the first page warns that the offering is high risk. A lengthy section describes risk factors. The memorandum emphasizes the investment's suitability only for those of substantial means because it is highly risky. A specific warning says that the forecasts are only estimates of future results and that no representation can be made about future operations. The value of the investment's income or loss to the investor is disclaimed; the value of the *loss* is mentioned because this project was supported by tax benefits; and the assumptions on which the forecast was based are described as uncontrollable. Given the cautionary nature of the memorandum and particularly of Deloitte's review report itself, reliance on Deloitte's report in making a decision to invest in Triad was not justifiable as a matter of law. *See, e.g., Topalian v. Ehrman,* 954 F.2d 1125, 1132 n. 15 (5th Cir. 1992) (Judge Black's grant of summary judgment on 10(b), Texas Security Act, and common law fraud claims affirmed because the offering memoranda warned of the very risks (failure to make a return on the investment) of which the plaintiffs complained, noting that the "offering memorandum clearly states that the investors might never see a penny of their investments and might never make a profit," and concluding that because "an adult is responsible for reading the documents he signs," summary judgment was right); *Krim v. BancTexas Group, Inc.,* 989 F.2d 1435, 1448 (5th Cir. 1993) (summary judgment granted for the defendant on plaintiffs' federal securities fraud claims, in part, because the offering prospectus (1) clearly warned of problems of which the plaintiff complained, (2) could not, because of the warnings expressed, support an allegation of knowing misstatements, and (3) made alleged omissions immaterial because of the specific risk warnings contained in the prospectus); *Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986) (where the plaintiffs were purchasers of limited partnership investments, claiming that the offering document made certain false and misleading statements, the court found that the "Offering Memorandum made it quite clear that its projections ... were necessarily speculative in nature and that no assurance could be given that these projections would be realized," holding that liability could not be imposed on the basis of such cautionary statements).

Before the accountant would be obliged to disclose that potential income and cost were misstated in the forecasts, the accountant

would have to be able to know that the data were wrong. Projections are not reports of historic, known data. The accountant told the investors that the operating figures were guesses. *See, e.g., Moorhead v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 949 F.2d 243 (8th Cir.1991) (summary judgment affirmed because a federal securities fraud claim could not be based on an accountant's feasibility study containing specific cautionary language virtually identical to that involved here); *O'Brien v. National Property Analysts Partners,* 936 F.2d 674 (2d Cir. 1991) (common law and securities law claims against an accountant who prepared a review report on financial projections contained in an offering memorandum were dismissed because the report specifically warned investors in language virtually identical to that involved here that the projections may not be achieved); *Kenney v. Deloitte, Haskins & Sells,* No. C91–0590, 1993 WL 255431 (N.D.Cal. Jan. 27, 1993) (where offering memorandum stated that, identical as here, the forecast was "presented in conformity with applicable accounting guidelines for presentation of a financial forecast" and that "the underlying assumptions provide a reasonable basis for the General Partners' Forecast," and warning that "some assumptions ... will not materialize ... and the results achieved ... [would] vary from the forecast"; the court concluded that "given the ample warnings in [Deloitte's] Report and in the PPM against relying on the projections, any reliance on the financial forecast was unreasonable as a matter of law"); *In re National Smelting of New Jersey, Inc. Bondholders Litigation,* 722 F.Supp. 152, 171 (D.N.J.1989) (summary judgment on federal securities fraud claims granted for accountant defendant who conducted a review and prepared a draft of a financial forecast attached as an exhibit to an offering memorandum because the accountant's review report contained cautionary language identical to that involved here).

### B. *Disclosures.*

While apparently Deloitte did not disclose that Triad had no successful experience in the wind-park business, the memorandum described Triad's experience. Even if Triad had said that it had been successful, Deloitte was not engaged to audit the other partnerships. Triad's lack of "successful" experience is the only fact Cogan identifies that he was not told. The experience is not misstated by the accountant or anyone. Triad's experience with windmills is not something about which accountants are needed to opine. The forecasts were not derived from assumptions about Triad's experience. The financial statements clearly show that Triad had lost money on generating electricity.

### C. *Standards.*

Cogan accuses Deloitte of failing to follow the guidelines for accountants who review projections. Cogan insists that, if the projections had been properly reviewed, he would have understood that the investment would lose money. He says that the assumptions in the memorandum do not support the projections.

The investors rely on Howard Shapiro's affidavit to raise the issue of Deloitte's not properly preparing the review. Besides being conclusory, Shapiro is contradictory. He does not thoughtfully attempt to analyze the review or forecast; rather, he fails to do what he says Deloitte should have done. He claims that (a) Deloitte should have hired engineers to review the scientific assumptions and that (b) an engineer would have told them that the income figures were exaggerated. He does not know this. Shapiro's diatribe is not an explanation of what was wrong with the review at the time it was done with an articulate reference to a legally recognized standard.

Does the accountant examine the assumptions? He examines the assumptions only to the extent that they are said to be a basis for the forecasts. The accountant looks at the relation of the assumptions to the projected financial results. The accountant's letter says that it is a review of the financial forecast of the general partner of Triad VII. It says that the accountant evaluated the assumptions of the management and the preparation and presentation of the forecast. It has several disclaimers, including a warning

that the actual results will vary materially from the forecast.

The review says that the underlying assumptions are a reasonable basis for the forecast. It does not say that the assumptions are in themselves reasonable. The standards negate the accountants' responsibility for a warranty of actual results. The version of the standards in effect in the middle 1980s said:

> In performing a compilation of prospective financial statements the accountant should:
>
> > Ask how the responsible party develops its assumptions.
> >
> > Obtain a list of significant assumptions and consider whether there are any *obvious* omissions in light of the key factors.
> >
> > Consider whether there appear to be any *obvious* internal inconsistencies in the assumptions.
> >
> > Test the mathematical accuracy of the computations that translate the assumptions into prospective financial statements.
> >
> > Consider whether [t]he statements, including the summary of significant assumptions, appear to be *not obviously* inappropriate in relation to the accountant's knowledge of the entity and its industry.

*Statement on Standards for Accountants' Services on Prospective Financial Information*, AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, app. B, ¶ 5 (1985) (ellipses omitted) (emphasis added). The standards further provide that:

> A compilation is not intended to provide assurance on ... the assumptions underlying such statements. Because of the limited nature of the accountant's procedures, a compilation does not provide assurance that the accountant will become aware of significant matters that might be disclosed by more extensive procedures, [like] an examination....

*Id.* at 7, ¶ 11.

■ What does it mean when an accountant says that he has undertaken to evaluate the assumptions of an offering memorandum? Accountants evaluate the assump-

tions about operating and market data to determine whether, if true, those facts could translate into financial results similar to the forecast in the accounting data. There is a difference between the review of prospective financial information and the audit of historical financial statements. *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 651 F.Supp 877, 881 (D.Conn.1986) (pointing out that a review of prospective financial information is not an audit with all the requirements and testing inherent in an audit); *Friedman v. Arizona World Nurseries Limited Partnership*, 730 F.Supp. 521, 532 (S.D.N.Y.1990) (accountant who was provided independent appraisal by general partner of a limited partnership to support certain assumptions in projections is not responsible for verifying whether the appraisal is true and accurate). Deloitte addressed whether the assumptions were a reasonable basis for Triad's projected results, not whether the assumptions were the most probable result. An accountant does not conclude that an outcome is more probable because realization of the forecasted results may be dependent on management's intentions and performance. The accountant cannot vouch for achievability. Indeed, different but similarly reasonable assumptions could be derived from the same information. Cogan's allegations that Deloitte violated accounting guidelines and that Deloitte's motive to participate in fraud was to obtain lucrative auditing fees in the future are not sufficient to assert a fraud claim. *See Melder v. Morris*, 27 F.3d 1097 (5th Cir.1994) (allegations of fraudulent intent against an accountant requires more than simply alleging that the accountant "knew of" the fraud or "recklessly disregarded" the fraud, they must particularize accountants intent; thus, a fraud claim is not stated against an accountant based simply on allegations that the accountant violated certain specific accounting standards). Moreover, because Cogan's allegations against Deloitte are belied by the language in Deloitte's review report and the offering memorandum itself, Cogan and the other investors have failed to state a claim as a matter of law.

The investors would have the accountant hire its own engineer to review the work of the promoter's engineer. Although accountants today do operating audits as part of their consulting practice, even an operating audit is by definition a historical review rather than a projection. Of course, an operating audit is still not an engineering audit. Because the financial forecasts depend on assumptions about the population of Southern California, about the consumption of electricity, and about the regulation of utilities, the investor would have the accountant hire his own demographer, economist, and lobbyist.

### D. *Investment Advice.*

 Finally, Cogan complains that Deloitte gave investment seminars jointly with Triad, telling potential investors what a great investment Triad would be and how carefully they had reviewed the forecast. Cogan claims that under the auspices of tax advice, Deloitte recommended Triad as a tax shelter to the investors who needed them. Cogan's evidence does not support these assertions. There was only a single seminar in Seattle with two presentations. Moreover, Deloitte said nothing in the seminars about an investment in Triad; as the plaintiffs' evidence itself shows, Deloitte spoke only on the subject of taxation. Perhaps even more compelling, only one of the plaintiffs actually attended the seminar. These seminars do not qualify as the "sale" of a security. 15 U.S.C. § 78j (1994) (the SEC's § 10(b)). Even the broadest and most flexible construction of the term could not encompass an accountant's explaining the needs and virtues of tax shelters.

Deloitte made it clear in its review report that the report was not a tax shelter opinion. The tax ramifications of the investment were discussed in the offering memorandum, at great length. The plaintiffs' claims in this action most certainly are not based on a purported failure to receive tax benefits: they obtained the benefits and when the IRS audited them, they prevailed against the IRS.

Deloitte & Touche is not liable to the investors under the theories presented.

### 9. *Deceptive Trade Practices.*

 At the last hearing before this court, the investors were allowed to amend their complaint for the fourth time. The purpose of the amendment was to pare down the document and omit defendants who were no longer parties to the case. Instead the plaintiffs included brand new causes of action under the Texas consumer protection act and "comparable statutes of other states." Deceptive Trade Practices Act, TEX.BUS. & COMM.CODE ANN. § 17.50(a) (1994). This court did not grant leave for the investors to add a cause of action under the Texas consumer protection act five years after the original complaint was filed. Cogan's request to amend came after discovery was closed and the case was awaiting trial; he had ample opportunity to assert the claims in a timely manner, and the proposed amendment was not the result of newly gathered information. The plaintiffs have delayed beyond a reasonable time. *See, e.g., Addington v. Farmer's Elevator Mut. Ins. Co.,* 650 F.2d 663 (5th Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981).

 Even if the complaint were timely, Cogan has failed to state a claim. The DTPA does not attach derivative liability to a defendant based on innocent involvement in a business transaction. *Charles E. Beard, Inc. v. Cameronics Technology Corp., Ltd.,* 729 F.Supp. 528, 532 (E.D.Tex.1989), *aff'd,* 939 F.2d 280 (5th Cir.1991) (a plaintiff cannot hold multiple defendants liable under the DTPA by showing them to be "inextricably intertwined"; the mere existence of a "relationship" between the parties does not establish DTPA liability).

 Even if the complaint were timely filed and Cogan had managed to state a claim, the same bar applies to his DTPA claim as did with his fraudulent insurance claim against Lloyd's: every operative fact occurred outside of the state of Texas. The DTPA requires that the "trade or commerce" in question "directly or indirectly affect[ ] the people of this state." TEX.BUS. & COMM.CODE ANN. § 17.45(6) (1994). *See Reed v. Israel Nat'l Oil Co.,* 681 S.W.2d 228 (Tex.App.— Houston [1st Dist.] 1984, no writ) (sale of

drill pipe in Singapore to Israeli company was "trade or commerce directly or indirectly affecting the people of this state," where seller resided in state, had base of operations in state, and placed proceeds of sale in his bank account in state, and his partner in the transaction was also a state resident). The investors will take nothing from the defendants under the DTPA.

10. *Aiding and Abetting.*

■ An individual investor may not sue someone for helping the issuer sell a security through having furnished a service to the issuer. "Congress knew how to impose aiding and abetting liability when it chose to do so.... If ... Congress intended to impose aiding and abetting liability [in a § 10(b) cause of action], we presume it would have used the words 'aid' and 'abet' in the statutory text. But it did not." *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, ——, 114 S.Ct. 1439, 1448, 128 L.Ed.2d 119 (1994) (citations omitted); *see also Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539 (1975) ("When Congress wished to provide a remedy to those who neither purchase nor sell securities, it had little trouble in doing so expressly").

11. *Conclusion.*

A group of investors in a high-risk tax shelter sued the issuer's insurance broker, insurance company, and accountants as well as their own bank and banker. Their investment in speculative generation of electricity from desert winds suffered a substantial loss when the business had several years of problems. These investors have generated little electricity but huge transaction costs for others who dealt with them and those who dealt with those who dealt with them. Using every cause of action and suing every party imaginable, they attempted to thrust the responsibility for their decision on everyone else. They go around swearing that they relied on everyone and everything except their own judgment. Although several of these parties have been voluntarily dismissed at earlier stages in the case, a full inquiry was necessary to show the breadth and indis-criminate nature of Cogan's approach to this litigation. Only the age of the case and the hope of not protracting the litigation keep the court from imposing sanctions.

The investors will take nothing from the defendants under their claims.